**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ALLAN STEVO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 07 C 6647** |
| | ) | |
| **PAMELA FRASOR, et al.,** | ) | **Magistrate Judge Sheila Finnegan** |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Allan Stevo alleges that the City of Blue Island, Illinois, City Clerk Pamela Frasor, Mayor Donald E. Peloquin, the City's Aldermen, and the City's attorney Cary A. Horvath (collectively "Defendants") shut off the water at his residence in violation of his rights to due process and equal protection under 42 U.S.C. § 1983. Defendants have moved for summary judgment, contending that Plaintiff was given fair warning over many months that the water would be turned off if he did not install an outdoor water meter as required of all water customers under a City ordinance. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).[1] For the reasons stated below, Defendants' motion for summary judgment is granted.

---

[1] The case was assigned to this Court on April 26, 2010.

<u>**STATEMENT OF FACTS**</u>[2]

**A.    Plaintiff's Background**

Plaintiff, a lifelong resident of Blue Island, has at all relevant times resided with his

wife at 2324 West Union Street.  (Doc. 67-4, at 1, 8).  He also owns three other residential

properties in Blue Island.  (*Id.* at 5).  For many years, Plaintiff has been employed as a

railroad switchman, a job that typically takes him out of the home all day on weekdays.  (*Id.*

at 10, 13).  Plaintiff's wife does not work outside the home.  (*Id.* at 18).  For several

decades, Plaintiff has been active in Blue Island politics, serving as an Alderman and

running as a candidate for Mayor against Defendant Peloquin.  (Second Amended

Complaint ("SAC"), Doc. 78, ¶ 24).  From the Fall of 2004 to the Spring of 2005, Plaintiff

actively supported Defendant Peloquin's opponent in the mayoral race.  (*Id.*).

**B.    The Blue Island Water Ordinance**

Blue Island's current water ordinance was adopted in 1956.  (Doc. 67-6, at 29).

Section 2(C) provides that water service is subject to the express conditions and provisions

of the Ordinance.  (*Id.* at 13-14).  Section 3 declares that "[a]ll water taken from the Water

Mains of this City shall be metered through meters furnished and approved by the City, as

hereinafter provided . . . ."  (*Id.* at 14).  Section 11 specifies that the meters "shall be of

such type, size, and construction as the City may specify, and that "[a]ll meters shall be

installed as close as possible to the entry point of the service pipe, such location to satisfy

---

[2]        As discussed below, both parties have failed to comply with Local Rule 56.1.  The
following statement of facts is drawn from Defendants' well-supported factual submissions and
documentation, as well as Plaintiff's pleadings and deposition testimony.  The Court notes that
Plaintiff has expressly declined to submit any additional documentation in opposition to summary
judgment.

the City Water Department." (*Id.* at 15-16). Section 25(E) provides that water shall be shut off five days after a notice of delinquency warning of disconnection is delivered to the address of record, and that service will not be restored until payment is made and all other provisions of the ordinance are complied with, though the Water Committee of the City Council may allow service to continue upon a request for payment by installment. (*Id.* at 25).

On October 9, 2001, the City Council of Blue Island amended its water ordinance to require its water customers to install meters on the exterior of buildings. (*Id.* at 30-31). According to Gary Koszlowski, Blue Island's Superintendent of Water and Sewer, the ordinance was amended to protect the residents from home intrusion by imposter meter readers, to protect the readers from the occasional dog bite, and to ensure that meters could be read when a customer was away from home. (Doc. 67-3, at 30-31). Mr. Koszlowski is responsible for making initial determinations as to whether a customer's water service will be disconnected for delinquency or for other reasons consistent with the City Water Ordinance. (*Id.* at 60-61). Customers are subject to having their water disconnected if they owe more than three hundred dollars, though they can appeal in writing to the Municipal Services Committee. (*Id.* at 22-23, 62-63). Mr. Koszlowski would forbear disconnecting a customer's water service if the customer called to reschedule installation of an outdoor meter, or if the customer had a complaint pending with Mr. Koszlowski or the Municipal Services Committee. (*Id.* at 24, 26-27).

Following the adoption of the amendment to the water ordinance in the fall of 2001, the City began notifying customers in their water bills of the need to arrange for the installation of outside meters. (*Id.* at 31). Thereafter, the City mailed individual reminders

to the customers who had not yet complied.  Defendants produced such a letter to Plaintiff dated November 14, 2003, though Plaintiff does not recall receiving it.  (Doc. 67-2, at 1; Doc. 67-4, at 20).

As of early 2005, only about 250 residences out of 5500 still had not been refitted with outdoor meters.  (Doc. 67-3, at 35-36).  Since the department lacked crews to install the remaining 250 meters at once, Mr. Koszlowski's department then began sending out additional notices to these customers in groups of 20-25.  Defendants produced such a letter to Plaintiff dated January 13, 2005; Plaintiff again has no recollection of receiving it.  (Doc. 67-2, at 2; Doc. 67-4, at 23-24).  Both letters to Plaintiff gave a phone number to call with any questions.

Mr. Koszlowski testified that, in addition to sending Plaintiff letters, he often reminded Plaintiff to have outdoor meters installed when Plaintiff paid his water bills in person at City Hall.  (*Id.* at 40).  Mr. Koszlowski explained that as longtime fellow residents of Blue Island, he and Plaintiff have known each other for many years.  (*Id.* at 7).  Plaintiff never set a time for installing a meter at his residence, nor did he explain his failure to do so.  (*Id.* at 40).  Plaintiff did, however, arrange to have meters installed at two other buildings that he owned and paid the associated fifty dollar fee.  (Doc. 67-4, at 7-8).

## C.    Termination of Plaintiff's Water Service

In April 2005, in accordance with standard departmental procedure, a notice was posted on the door at Plaintiff's house stating that the water would be disconnected on or after April 19, 2005 unless Plaintiff paid $351.03 in arrearages and installed an outdoor meter.  (Doc. 67-2, at 6; Doc. 67-3, at 43-44).  Plaintiff denies ever seeing this notice on his

door; however, on April 14, 2005, Plaintiff paid his bill in full, including arrearages.  (Doc. 67-4, at 33-34; Doc. 67-3 at 45-46).

The next day, Mr. Koszlowski sent Plaintiff a certified letter thanking him for his payment, but informing him that his water service would be discontinued if he did not complete the installation of an outdoor meter by April 27, 2005.  That letter provided a phone number to call "to set up a time to have this completed."  (Doc. 67-2, at 3).  The certified letter was refused, but Plaintiff testified that he did not know who declined to accept it.  (Doc. 67-2, at 4; Doc. 67-4, at 31-32).

Plaintiff claimed that he informed Mr. Koszlowski during a face-to-face conversation in April 2005 that he could be present to allow the meter to be installed on weekends, or the following November when he went on vacation.  (Doc. 67-4, at 24-25).  Plaintiff did not want the installation to proceed outside of his presence out of a concern for his wife's safety.  (*Id.* at 61).  Mr. Koszlowski has no recollection of Plaintiff's proposals.  (Doc. 67-3, at 40).  Plaintiff did not recall Mr. Koszlowski's response, but insisted that he was never informed at any time that his water service could be disconnected if he failed to arrange to have an outdoor meter installed.  (Doc. 67-4, at 25, 49).

Blue Island shut off Plaintiff's water around April 27, 2005.  (*Id.* at 35).  Mr. Koszlowski acknowledged discussing the decision to disconnect Plaintiff's water with the Mayor and the City Clerk, but denied that they or any political considerations influenced his decision.  (Doc. 67-3, at 61).

On May 5, 2005, Plaintiff attended a Municipal Services Committee meeting to lodge a complaint about his water being turned off and was told that his complaint had to be submitted in writing.  (Doc. 67-4, at 40).  Plaintiff said he then hand-delivered a letter to the

home of the Committee's Chairman, Alderman Mark Ruthenberg, that evening. (*Id.* at 41).

Plaintiff was unable to produce a copy of the letter, which he testified he handed to Mr.

Ruthenberg's teenage son. (*Id.* at 62). Plaintiff also testified that he wrote a letter to the

Municipal Services Committee in June 2005, and addressed the Committee at a public

meeting; however, the Committee informed him that it was not prepared to hear his

complaint. (*Id.* at 44-45). Plaintiff did not produce a copy of this letter either.

On June 12, 2005, Plaintiff spoke with Mr. Koszlowski at City Hall and arranged for

the installation of an outdoor meter. (*Id.* at 28). On June 14, 2005, the meter was installed

and, within an hour, Mr. Koszlowski restored the water service. (*Id.* at 28-29; Doc. 67-6,

at 11). During the seven weeks without water service, Plaintiff continued to live in his

residence by carrying buckets of water from another property that he owned across the

street. (Doc. 67-4, at 36).

**D.    Other Properties Without Outside Meters**

Plaintiff testified that he was unaware of anyone else in Blue Island whose water

service had been disconnected for failure to install an outdoor meter. (*Id.* at 59). He also

testified that as of 2009 there were buildings in Blue Island without an outdoor water meter;

however, he could only specifically identify a single apartment building without one (at

12843 Gregory), and admitted that he knew of no single-family house without an outdoor

water meter. (*Id.* at 59-60). According to Mr. Koszlowski, every resident except Plaintiff

arranged for the installation of an outdoor meter within 60 days of receiving a second letter.

(Doc. 67-3, at 38).

## DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*; *accord, Spivey v. Adaptive Marketing LLC*, 622 F.3d 816, 822 (7th Cir. 2010).  In determining whether summary judgment should be granted, a court must consider the evidentiary record in the light most favorable to non-movants, drawing all reasonable inferences in their favor.  *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).  But a non-movant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial."  *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008).  As Rule 56(e)(2) makes clear:

> [w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e)(2). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## B.      Preliminary Matters

As an initial matter, the Court declines Plaintiff's request to deny the motion for summary judgment because Defendants did not comply in all respects with Local Rule 56.1. As Plaintiff notes, Defendants did not submit a supporting memorandum (their legal arguments instead were included in the motion itself), and did not number the paragraphs in their short Statement of Uncontested Facts. While "[f]ailure to comply with Local Rule 56.1 is grounds for denial of a summary judgment motion," *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, No. 07 C 1668, 2010 WL 2035720, at *5 (N.D. Ill. May 19, 2010), a district court has broad discretion in deciding whether to require strict compliance with a local rule. *See Ammons v. Aramark,* 368 F.3d 809, 817 (7th Cir. 2004); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[I]t is clear that the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion.")

In this case, Plaintiff suffered no prejudice from Defendants' decision to set forth the legal arguments in support of summary judgment in the motion itself rather than in a separate memorandum. As for Defendants' Statement of Uncontested Facts, it is only five and a half pages long, and each paragraph, though unnumbered, is supported by a record citation. In the Court's view, Plaintiff easily could have responded to Defendants' facts while still preserving his procedural objection.

It is also worth noting that Plaintiff himself violated Rule 56.1 by ignoring the rule's express requirement to respond to Defendants' factual statements. Plaintiff provided no

response to any of the factual statements (or the legal arguments for that matter). Under the law, the Court could therefore deem all of the factual allegations admitted by Plaintiff. *See Waldridge v. American Hoechst Corp*, 24 F.3d 918, 923-24 (7th Cir. 1990); *BBC Chartering & Logistic GmbH & Co. K.G. v. Rotec Indus., Inc.*, No. 08 C 2279, 2010 WL 4719695, at *1 (N.D. Ill. Nov. 15, 2010) ("Because [the non-moving party] has failed to respond to [the moving party's] 56.1(a) statement of fact, [the non-moving party's] factual allegations are deemed admitted.")

Rather than penalize the parties for their respective violations of the local rule or require additional briefing that will further delay the disposition of this long-standing case, the Court opts to excuse the violations and move ahead with consideration of the substantive legal issues.[3]

Before doing so, the Court addresses one final preliminary matter. Plaintiff brings this action against Blue Island, and against the individual defendants personally and in their official capacities. An action against an official in his or her official capacity is a suit against the entity itself. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *Jungels v. Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987). Therefore, and as Defendants contend, when the entity is also sued, the official-capacity claims against the individuals are redundant. *Id.*; *Toronyi v. Barrington Cmty. Unit Sch. Dist. 220,* No. 03 C 3949, 2005 WL 388568, at *7 (N.D. Ill. Feb. 10, 2005). Defendants' motion to dismiss these unnecessary official-capacity claims

---

[3]     The Court held a telephonic status hearing on November 22, 2010 to inform the parties of this decision. During the status hearing, the Court indicated that it would assume that Plaintiff was disputing all of the Defendants' factual statements and would not deem them admitted. The Court also informed Plaintiff that he would be allowed another opportunity to submit evidentiary material for the Court's consideration. (Minute Order of 11/22/10, Doc. 85.) No such material was provided.

is granted. The Court now turns to the merits of the due process and equal protection claims against the City of Blue Island.

**C**.     **Due Process Claim**

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law . . . ."  Plaintiff alleges in Counts 1 through 4 that Defendants denied him due process when they shut off his water around April 27, 2005.  To make out a claim under the Due Process Clause, Plaintiff must show that he had a property interest in his water service, and that Defendants deprived him of that interest without affording him the process he was due.  *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989).

**1.     Property Interest**

Plaintiff asserts that "[w]ater service is a protected property interest within the meaning of the Due Process Clause of the Fourteenth Amendment."  (SAC ¶¶ 32, 38).  To prevail on this theory, Plaintiff must show either that Illinois law affords him a right to water service, or that his contractual arrangement with Blue Island gave him a right to continued service at the time it was disconnected, on or around April 27, 2005.  This is because property rights are protected by the Constitution, but they are not created by it, arising instead from some independent source such as state law that gives a person a "legitimate claim of entitlement."  *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972).  The Supreme Court has identified state statutes establishing such a right or contracts with a state agency as two principal sources of such an entitlement.  *See id.* at 576-77;  *Sterling v. Village of Maywood*, 579 F.2d 1350, 1353 (7th Cir. 1978).

Plaintiff has not cited to any statute giving him a right to water service under Illinois law, nor is the Court aware of any such provision. To the contrary, Illinois delegates to its municipalities the right to own and operate water utilities. 65 ILCS 5/11-125-1 (2010). As part of that delegation, a municipality's mayor and aldermen

> may make all needful rules and regulations concerning the use of water supplied by the waterworks of the city or village, and may do all acts and make such rules and regulations for the construction, completion, management, or control of the waterworks, and for the fixing and collecting of such water rates or rents as the corporate authorities may deem necessary or expedient.

65 ILCS 5/11-125-3 (2010). Pursuant to that regulatory authority, Blue Island enacted a Water Ordinance that requires prior application, inspection, and approval before it will provide water service. Thus, no resident of Blue Island, Plaintiff included, has an absolute entitlement to water service under Illinois law. *See Sterling*, 579 F.2d at 1354.

Any possible right to water service that Plaintiff had, then, was contractual. *See Brooks v. Village of Wilmette*, 72 Ill. App. 3d 753, 756, 391 N.E.2d 133, 136 (1st Dist. 1979) (relationship between customer and municipal utility is essentially one of contract); *Wagner v. City of Rock Island*, 146 Ill. 139, 153, 34 N.E. 545 (1893) (same). To have a contractual entitlement to service, however, Plaintiff would have to show that he fulfilled his end of the bargain. It is clear that he has not.

As noted above, 65 ILCS 5/11-125-3 gives municipalities the authority to make rules and regulations they deem "necessary or expedient" for the management of their waterworks, and such regulations become implied terms of the parties' contract by operation of law. *Brooks,* 72 Ill. App. 3d at 756, 391 N.E.2d at 136; *see also Huston v. City Gas & Elec. Co.*, 158 Ill. App. 307, 1910 WL 2375, at *4 (3d Dist. 1910) (ordinance gives

municipal heat utility the right to set "reasonable" conditions on service*); cf. Oklahoma Natural Gas Co. v. Young*, 116 F.2d 720, 722-23 (10th Cir. 1940) (collecting cases illustrating the common-law right of public utilities to set reasonable conditions on the provision of service).  The 2001 Amendment to the Blue Island Water Ordinance sets just such an expedient condition.  Mr. Koszlowski testified that the Ordinance was adopted to protect the safety of meter readers and homeowners, and to ensure that the City's bills were based on actual usage and not the estimates it had to use when meter readers were unable to gain access to indoor meters.  Mr. Koszlowski also testified that when Plaintiff finally called on June 12, 2005 to arrange for the installation of an outside meter, it took about an hour and cost Plaintiff fifty dollars.  Since outside meters contribute to the accuracy of the City's water bills, and hence to their collection, as well as to public safety, and their installation involved only a very limited imposition in time and money on Plaintiff, it was entirely reasonable for Blue Island to require the installation of outside meters as a condition of service.  *See Anderson v. Village of Berwyn*, 135 Ill. App. 8, 1905 WL 3936, at *5-6 (1st Dist. 1905) (municipality could require the installation of a particular brand of water meter, and deny service to anyone who has not installed such a meter by a certain date); *cf. Hawkins v. Vermont Hydro-Elec. Corp.*, 98 Vt. 176, 126 A. 517, 519-20 (Vt. 1924) (electric utility could refuse to supply power to a house whose equipment did not comply with the utility's published standards).

Plaintiff alleges that the 2001 Amendment does not provide for disconnection for failure to install an outside meter.  (SAC ¶ 16).  Any argument that Plaintiff's failure to install an outside meter did not excuse Blue Island from its obligation to provide service lacks merit for two reasons.  First, as was just discussed, Blue Island was entitled to impose

outside metering as a term in its contract with Plaintiff. In 2001, outside metering became part of the consideration Plaintiff implicitly promised in exchange for Blue Island's promise of service. As a matter of hornbook contract law, Plaintiff's failure to fulfill that promise excused Blue Island from fulfilling its promise, even if the Ordinance did not say so explicitly. *See* Restatement (Second) of Contracts §§ 231, 237 (1981).

Second, Section 2 of the Ordinance in fact did expressly condition service on compliance with all of its terms. One such term, found in Section 3, requires that all customers install meters, and Section 11 gives the City the right to determine the type and location of the meters. The 2001 Amendment exercised this authority, already reserved in 1956, by specifying that going forward all meters must be outside. Thus, Plaintiff's contention that the 2001 Amendment did not provide for disconnection for failure to install an outside meter misses the mark, as the original ordinance gave Plaintiff no right to service unless he complied with all of its terms.

Having failed to fulfill Blue Island's reasonable condition for receiving water service, and in the absence of any affirmative right to water service under state law, Plaintiff lacked a property interest in continuing to receive that service. In such circumstances, the loss of water service did not implicate the Due Process Clause.

### 2.    Procedural Due Process

Even if Plaintiff had an entitlement to water service, the procedures provided by the Blue Island Water and Sewer Department for terminating that service met constitutional standards. "An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [proceeding] and afford them an opportunity to present their objections."

13

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Following *Mullane,* the Supreme Court in *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978), held that a municipal utility customer whose liability is legitimately in dispute must be given "notice informing the customer not only of the possibility of termination but also of a procedure for challenging a disputed bill," and "an established procedure for resolution of disputes." *Id.* at 12 (citations omitted).

The dispute in the present case involves the timing of the installation of an outside meter and not the amount owed on an account; the Court therefore adapts the standards set out in *Mullane* and *Memphis Light* to the present dispute as follows. To survive Defendants' motion for summary judgment, Plaintiff must either show that the procedures for resolving the dispute as to the timing of the meter installation were legally inadequate, or point to evidence in the record sufficient to permit a reasonable jury to find that the notice was not reasonably calculated to inform him of the impending shutoff and the procedure for objecting to its timing. Given the evidence of record, the Court holds that the procedures afforded were more than constitutionally sufficient, and that no reasonable jury could conclude that the notice provided was inadequate.

### a. Procedures

A court assessing the adequacy of the procedures safeguarding a private property interest must balance the three factors announced in *Mathews v. Eldridge,* 424 U.S. 319 (1976): the private interest in question; the risk of an erroneous deprivation and the value, if any, of potential additional or substitute safeguards; and the Government's interest, including the burden of any changes in its procedures. *Id.* at 334-35. In *Memphis Light,* the Supreme Court held, under the *Mathews* analysis, that due process would be satisfied

by "the provision of an opportunity for the presentation to a designated employee of a customer's complaint that he is being overcharged or charged for services not rendered." 436 U.S. at 16. As the Court explained, "some administrative procedure for entertaining customer complaints prior to termination is required to afford reasonable assurance against erroneous or arbitrary withholding of essential services." *Id.* at 18.

Here, the procedures made available to Plaintiff included contacting Mr. Koszlowski to obtain a reprieve at numbers provided in the various letters Mr. Koszlowski sent him, and filing a written request for a hearing before the Water Committee of the City Council. Mr. Koszlowski testified that had Plaintiff done either he would not have ordered Plaintiff's service disconnected, and Plaintiff has adduced no evidence to contradict that testimony. These procedures exceed those deemed sufficient in *Memphis Light*.

Plaintiff testified in his deposition at some length about the difficulties he had in obtaining a hearing before the Municipal Services Committee of the City Council. These difficulties were encountered, however, only after service had been disconnected and Plaintiff sought an expedited hearing. There is no evidence before the Court that the Municipal Services Committee would have been unreceptive to Plaintiff's need for some additional time had he presented a written request during the three and a half years that elapsed before the City disconnected his water service for failure to comply with the outside-metering requirement; in fact, Mr. Koszlowski's testimony was directly to the contrary.

Plaintiff also asserts that he proposed to Mr. Koszlowski in April 2005 that he would be available to have an outside meter installed on a Saturday or in November. He does not recall Mr. Koszlowski's reply, and Mr. Koszlowski does not recall the conversation at

all. Even assuming this conversation occurred and Mr. Koszlowski rejected Plaintiff's proposal, this would not constitute evidence that the avenue of appeal was a sham, or in any other way inadequate. The Due Process Clause does not guarantee that every dispute will be resolved in the customer's favor. The process that the Fourteenth Amendment required the defendant in *Memphis Light* to provide was no more than the "opportunity to meet with designated personnel who were duly authorized to . . . correct any errors," 436 U.S. at 14 n.13. That is exactly what the present Plaintiff received from Blue Island.

### b. Notice

Blue Island's notice to Plaintiff of the impending shut-off was also more than adequate. The letters of November 14, 2003 and January 13, 2005, the certified letter sent April 15, 2005, and the contemporaneous posting that Mr. Koszlowski testified he left on Plaintiff's door all on their face gave Plaintiff notice that he was required to have an outdoor water meter installed. Both the certified letter and the posted notice also made clear that failure to have the meter installed would result in disconnection. All four communications gave Plaintiff a phone number he could call to arrange for the installation. In addition, Mr. Koszlowski testified that he told Plaintiff several times in person, including in April 2005, that he needed to arrange for the installation of the new meter.

Plaintiff denied and/or could not recall receiving any of these notices, and claimed that he first learned that his water service could be discontinued when he received a call from his wife stating that it had already been shut off. As an initial matter, Plaintiff did install outdoor water meters at two of his other buildings, which undermines any claim that he was unaware of the new requirement. Even assuming Plaintiff never received any of Defendants' communications, and was unaware of the impending disconnection until it was

16

a *fait accompli*, no reasonable jury could conclude that they were not "reasonably calculated" to give the required notice. Mr. Koszlowski testified without contradiction that in a town of 5500 residences, only Plaintiff failed to comply after the first two letters, and only he subsequently had his water shut off. It is also undisputed that delivery of the certified letter was attempted on April 15, 2005; that letter, which informed Plaintiff that his water would be shut off by April 27, 2005, and gave Mr. Koszlowski's phone number, was itself, under *Mullane* and *Memphis Light*, all the notice that due process requires.

In conclusion, Plaintiff had no cognizable property interest in maintaining his water service without complying with Blue Island's water ordinance as amended, and in any event, the process afforded him before his service was disconnected easily met constitutional standards. For these reasons, Plaintiff's Due Process claims fail as a matter of law.

**D.     Equal Protection**

In addition to its Due Process provision, the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." The essential guarantee of the Equal Protection Clause is that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). Where a government regulation or its enforcement treats people differently because of membership in a suspect class, or where the treatment impinges on a fundamental right, the action is subject to strict scrutiny. *Id.* at 216-17. In all other cases, the challenged action will be upheld if it "bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). To succeed in such a case, a plaintiff must "negative any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bd. of*

*Trs. of Univ. of Alabama v. Garrett,* 531 U.S. 356, 367 (2001).  Moreover, the government actor is under no obligation to articulate that rational basis, as long as one could be imagined.  *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

Plaintiff alleges in Counts 5 and 6 that by shutting off his water, while leaving other customers without outside meters connected, Defendants "intentionally treated [him] differently from others similarly situated and there was no rational basis for the difference in treatment," or, as the Supreme Court recently put it, "irrationally singled [him] out as a so-called 'class of one.'"  *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 601 (2008).  As evidence, Plaintiff points only to an apartment building across the street from his house that, at the time of his deposition on June 19, 2009, allegedly had no outside meters but was still receiving water service.   Defendants contest that an apartment building is sufficiently comparable to support an inference that Plaintiff was irrationally singled out. They also point out that Plaintiff was the only customer who failed to respond to the Water Department's numerous reminders and warnings.

There is a split in the Seventh Circuit as to the elements of a class-of-one claim: every class-of-one claimant must show disparate treatment, that is that he or she was treated differently from someone similarly situated; however, there has been some divergence as to the second element.  Some panels have said that the claimant must show that the disparate treatment was the product of illegitimate animus.  Other panels have held that the claimant need only show that the disparate treatment lacked any rational basis. *See McDonald v. Village of Winnetka*, 371 F.3d 992, 1001-02 (7th Cir. 2004) (collecting cases illustrating both theories).  As set forth below, on the record before the Court, Plaintiff has failed to show that there is a genuine issue of material fact as to any element under

either of these class-of-one theories. In the Court's view, the conduct of which Plaintiff complains could, at most, amount to uneven law enforcement and would not constitute a denial of the equal protection of the laws.

### 1.    Disparate Treatment

Turning to the first element under a class-of-one theory, Plaintiff must present evidence establishing disparate treatment by identifying someone who was similarly situated but intentionally treated differently from him.  In general, whether a given individual is similarly situated is a question for the jury.  *McDonald*, 371 F.3d at 1002.  The degree of similarity that the law requires, however, is very high: the comparator must be *"prima facie* identical in all relevant aspects."  *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009) (quoting *Purze v. Village of Winthrop Harbor*, 286 F.3d 452 (7th Cir. 2002)).[4]  Summary judgment is appropriate if no reasonable jury could find the required high degree of similarity.  *McDonald*, 371 F.3d at 1002.

Examination of recent decisions involving class-of-one claims illustrates the high degree of similarity that must be shown.   In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the plaintiff was a homeowner who alleged that the defendant required her to cede a 33-foot easement before it would provide her with water service, even though every other homeowner was only required to grant a 15-foot easement.  After denying her service for

---

[4]    It should be noted that some Seventh Circuit panels characterize the required comparator as "directly comparable in all material respects."  *See U.S. v. Moore,* 543 F.3d 891 (7th Cir. 2008) (citing both standards); *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680-83 (7th Cir. 2005).  On its face the latter formulation, which was taken from the standard for indirect proof of discrimination in the employment discrimination context, might seem less stringent, but *McDonald* characterizes them as imposing an "equally high burden."  371 F.3d at 1003.

three months, the village agreed that the standard easement was sufficient, and provided her with water service, implicitly acknowledging that she was indistinguishable from its other customers. These facts were held sufficient to state a class-of-one claim. *Id.* at 564-65. In contrast, where individuals submitted applications for different pier extensions or zoning variances at different times, *Bell v. Duperrault*, 367 F.3d 703, 707-08 (7th Cir. 2004); *Purze,* 286 F.3d at 455, or students of the same age and distance from school sought bus service but attended independently administered schools, *Racine Charter One, Inc.*, 424 F.3d at 680-83, they were deemed as a matter of law not sufficiently similarly situated to support a class-of-one claim.

Here, Plaintiff alleges that "hundreds of homes" lacked outdoor meters as of the date his service was disconnected, but they still received water service. (SAC ¶ 30). But the only evidence before this Court that similarly situated persons were treated differently is Plaintiff's statement in his deposition that the building located at 12843 Gregory had indoor metering but still received service. That building, by Plaintiff's own admission, is an apartment building. Plaintiff was unable to identify any single-family residence with indoor meters that continued receiving water service. The Court finds that apartment buildings and single-family residences are not *"prima facie* identical in all relevant respects," as they must be to support a class-of-one claim. *Srail*, 588 F.3d at 945. For one thing, the tenants, who would bear the brunt of any break in service, are typically not in the same position as the owner to ensure that the new meter is installed. In addition, shutting off water to a whole building would typically affect many more people than shutting off water to a house.[5]

_____

[5] Defendants argue that apartment buildings should be ruled out as comparators because the 2001 Amendment addressed only single-family residences. Although Blue Island

Moreover, even if the apartment building in question were a private house, it still would not be *prima facie* identical in all relevant respects unless the owner of the building had also failed to install an outdoor meter *after* receiving notice that he was required to do so. Mr. Koszlowski testified without contradiction that only Plaintiff failed to arrange for the installation of an outdoor meter after receiving a second notice. Blue Island certainly was not required–and Mr. Koszlowski testified it lacked the crews–to simultaneously disconnect all residents who disregarded the first notice. Blue Island fairly opted to provide additional notices, and, ultimately, only Plaintiff is known to have failed to respond to them. On the record before this Court, Plaintiff was different from all other customers in at least this one "relevant respect."

In the absence of any identifiable customer that a reasonable jury could find "*prima facie* identical [to Plaintiff] in all relevant respects," the Equal Protection claims cannot stand.

## 2. Illegitimate Animus or Absence of Rational Basis

The Court now turns to the second element of a class-of-one equal protection claim. Even if Plaintiff were able to show that a reasonable jury could find disparate treatment, Plaintiff would also have to show that the treatment was motivated by illegitimate animus, or at least that Blue Island lacked any rational basis for such different treatment. *See, e.g., McDonald*, 371 F.3d at 1001-02. Plaintiff has alleged that his water was disconnected

---

should be granted some deference in interpreting its own ordinance, this argument perhaps overreaches: the 2001 Amendment states simply that "[r]emote meters shall be installed in all residences served by the City of Blue Island's Waterworks System." Since the Court finds that apartment buildings are not sufficiently comparable to single-family residences to support a class-of-one claim even if the ordinance applies to them, it need not decide the reach of the 2001 Amendment.

because of his political views, which certainly could be characterized as a form of illegitimate animus, but he has adduced no evidence of this motivation in support of his response to Defendants' motion. Without any evidence to support his assertion of animus, an element on which he carries the burden of proof, Plaintiff has no basis for maintaining his equal protection claims. *See Celotex,* 477 U.S. at 323; *see also Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) ("Although a nonmoving party's own deposition may constitute affirmative evidence to defeat summary judgment, conclusory statements in the deposition do not create an issue of fact.").

Even if Plaintiff were only required to show the absence of any rational basis for treating Plaintiff differently (as certain panels in the Seventh Circuit have held), Plaintiff's claim still would fail. At best, Plaintiff is able to show (perhaps) that the apartment building across the street did not have an outdoor meter and yet continued to received water service. However, as noted above, there is a reasonably conceivable rational basis–which is all the Equal Protection Clause requires here–for distinguishing apartments and single-family homes in that the former is typically owner-occupied and the latter is not.[6] Again, Plaintiff has failed to adduce any evidence to meet his burden of demonstrating the complete absence of a rational basis for Defendants' actions.

_____

[6] It is no accident that this same distinction between apartments and single family homes was also highlighted during the earlier discussion of the disparate treatment element and the lack of a sufficiently similar comparator. No two people are absolutely identical; the relevant standard is whether they are "identically situated in all respects rationally related to the government's mission." *Indiana State Teachers Ass'n v. Bd. of Sch. Comm'rs of the City of Indianapolis*, 101 F.3d 1179,1181 (7th Cir. 1996). Thus, similarity and rationality are two sides of the same coin: if there is a reason related to the governmental purpose to distinguish two people, then they are not sufficiently similar to state a class-of-one claim, and if they are really identical in all relevant respects, then to treat them differently is irrational and hence violative of equal protection.

22

This would be so even if Plaintiff were somehow able to show that Blue Island chose to disconnect his water first (before all other non-compliant customers) for no reason at all, other than the need to start somewhere. Such disparate treatment would be no more unjust than the treatment of the one speeder among many who is pulled over by the police. Simply to assert that the City enforced its Water Ordinance against one resident and not against others, without more, would not make out a Constitutional claim. Such uneven law enforcement admittedly presents difficulties under a rational-basis analysis, since its essence is that one person was targeted instead of another not for any reason at all, but at random, or by happenstance. Nonetheless, although courts give different rationales, all agree that governments create no constitutional problem when they do so. *See Engquist,* 553 U.S. at 603-04 (uneven enforcement does not violate equal protection where choice of target is necessarily subjective); *Oyler v. Boles,* 368 U.S. 448, 456 (1962) (uneven enforcement constitutional unless based on suspect or other irrelevant classification); *Esmail v. Macrane*, 53 F.3d 176, 178-79 (7th Cir. 1995) (no equal protection violation where lack of resources prevents full enforcement). "The Constitution does not require states to enforce their laws (or cities their ordinances) with Prussian thoroughness as the price of being allowed to enforce them at all. Otherwise few speeders would have to pay traffic tickets. Selective, incomplete enforcement of the law is the norm in this country." *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir. 1985) (citations omitted).

In conclusion, Plaintiff has failed to produce any evidence that a very similarly situated water customer was treated differently by Blue Island, an essential element of his equal protection claim. Furthermore, even if the apartment building that Plaintiff identified in his deposition were regarded as sufficiently similar to support a class-of-one claim, the

difference in treatment was neither without rational basis nor the product of illegitimate animus, but (at most) constituted ordinary uneven law enforcement of a kind that raises no constitutional issues. Defendants are therefore entitled to judgment as a matter of law on Plaintiff's equal protection claims.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion for Summary judgment is GRANTED. Judgment shall be entered for Defendants.

ENTER:

Dated: 1/3/2011

SHEILA FINNEGAN
United States Magistrate Judge